CHARLES S. BARQUIST (CA SBN 133785)
CBarquist@mofo.com
DYLAN JAMES RAIFE (CA SBN 288346)
DRaife@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California  90017-3543
Telephone: 213.892.5200
Facsimile: 213.892.5454

Attorneys for Defendants Best Buy Co., Inc.,
Costco Wholesale Corp., and Target Corp.

Robert T. Cruzen (CA SBN 203658)
rob.cruzen@klarquist.com
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon  97204
Telephone:  503-595-5300
Facsimile:  503-595-5301

Attorneys for Defendant Amazon.com, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUARDIAN MEDIA TECHNOLOGIES, INC.,<br><br>                    Plaintiff,<br><br>    v.<br><br>AMAZON.COM, INC., et al.,<br><br>                    Defendants. | Case No. 2:13-cv-08369-PSG-PLA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS AMAZON, BEST BUY, COSTCO, AND TARGET'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 4,930,158**<br><br>Date: March 30, 2015<br>Time: 1:30 PM<br>Ctrm: 880<br><br>Honorable Philip S. Gutierrez |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND....................................................................................2

    A.    The Asserted Claims of the '158 Patent Are Directed to an "Auxiliary Device" for Playing Substitute Video Material..................2

    B.    Guardian's Infringement Contentions Do Not Identify an Auxiliary Device as Required by the Asserted Claims ......................3

    C.    The Asserted Claims Also Require Comparing a Set of Codes ..........4

    D.    Summary Judgment Of Non-Infringement In Sony ...........................5

        1.    Litigation History............................................................5

        2.    Motion for Summary Judgment Granted...................................6

    E.    The Accused DVD Players Do Not Replace Unwanted Content Within a Playing Video Program........................................................7

        1.    Operation of Accused DVD Players with Parental Control Disabled ..........................................................................7

        2.    Setting the Parental-Control Feature on the Accused Players .............................................................................9

        3.    Operation of Accused DVD Players with Parental Control Enabled ..........................................................................10

ARGUMENT ........................................................................................................13

I.    THE ACCUSED DVD PLAYERS DO NOT HAVE THE "AUXILIARY DEVICE" THAT THE CLAIMS REQUIRE ......................15

    A.    The Prior Construction of "Auxiliary Device" As "The Source of Substitute Video Material" Is Correct ...........................................15

    B.    The Accused Devices Include No "Auxiliary Device" and Therefore Do Not Infringe the '158 Patent.......................................18

II.    THE ACCUSED DVD PLAYERS DO NOT PERFORM A COMPARISON WITH A "SET OF SELECTED CODES" AS THE CLAIMS REQUIRE...................................................................................21

    A.    "Set of Selected Codes" Was Properly Construed As More Than One Code...........................................................................................22

    B.    The Accused Devices Do Not Perform a Comparison Against a "Set of Codes" and Therefore Do Not Infringe the '158 Patent.........23

CONCLUSION......................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*,
    268 F.3d 1352 (Fed. Cir. 2001) ....................................................13, 14

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,
    389 F.3d 1370 (Fed. Cir. 2004) ..........................................................14

*Freedman Seating Co. v. Am. Seating Co.*,
    420 F.3d 1350 (Fed. Cir. 2005) ..........................................................21

*Gemalto S.A. v. HTC Corp.*,
    754 F.3d 1364 (Fed. Cir. 2014) ..........................................................20

*Guardian Media Techs., Ltd. v. Acer Am. Corp.*,
    No. 6:10-cv-597, 2013 WL 1866901 (E.D. Tex. May 2, 2013)..................15, 16

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc) ..............................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..................................................................13

*Panduit Corp. v. HellermannTyton Corp.*,
    451 F.3d 819 (Fed. Cir. 2006) ..........................................................21

*PC Connector Solutions LLC v. SmartDisk Corp.*,
    406 F.3d 1359 (Fed. Cir. 2005) ....................................................13, 14

*Phillips v. AWH Corp.*,
    415 F.3d. 1303 (Fed. Cir. 2005) (en banc) ..........................................13, 14, 16

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002) ..........................................................14

*SkinMedica, Inc. v. Histogen Inc.*,
    727 F.3d 1187 (Fed. Cir. 2013) ..........................................................16

*Sony Elecs. Inc. v. Guardian Media Tech.*,
    497 F.3d 1271 (Fed. Cir. 2007) ...........................................................5

*Sony Elecs. Inc. v. Guardian Media Tech.*,
   No. 3:05-cv-01777,ECF No. 233 (S.D. Cal. Aug. 31, 2009).....................passim

*Superior Fireplace Co. v. Majestic Prods. Co.*,
   270 F.3d 1358 (Fed. Cir. 2001) .......................................................................22

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997) .................................................................................14, 21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ..............................................................................................13

## INTRODUCTION

Guardian Media Technologies, Ltd. is a company formed by a patent attorney solely to exploit two, now-expired patents:  U.S. Patent Nos. 4,930,158 and 4,930,160.  Both patents related to methods and devices for censoring video programs.  Guardian's complaints in these consolidated actions assert the '158 Patent against only four Defendants:  Amazon.com, Best Buy, Costco, and Target. This Motion is directed to the '158 patent and these Defendants request that the Court grant summary judgment of non-infringement.

Over the past ten years, Guardian has filed more than two dozen lawsuits against more than 60 defendants asserting infringement of U.S. Patent Nos. 4,930,158.  Guardian has *never won* a finding of liability against any defendant. Rather, in the only merits rulings Guardian has ever received, Guardian lost.  In that case, the Southern District of California granted summary judgment of non-infringement that DVD players made by Mitsubishi, Sony, and Toshiba did not infringe.[1]  (Ex. A to Declaration of Dylan Raife, No. 3:05-cv-01777, ECF No. 233 ("Order") at 19.)  Nevertheless, Guardian now asserts that DVD players sold by Defendants infringe the same DVD player technology accused in *Sony*.

The '158 Patent is directed to controlling what videos may be played by certain users.  The asserted claims of the '158 Patent concern replacing unwanted *portions* of a video program with *substitute* program material *from an auxiliary device*.  The question of law at issue in this motion has already been decided by Judge Irma E. Gonzalez of the Southern District.  In *Sony*, the DVD

---

[1] As it did in the Central District after it lost a motion for summary judgment of non-infringement of the '160 Patent, Guardian moved to vacate the summary judgment ruling after settlement, and the Court did so.  Nevertheless, the Order's reasoning remains valid.

players Guardian accused of infringement did not include an "auxiliary device" for the playing of substitute video material as required by all asserted claims. (Order at 11-13.) In addition, the court concluded that the accused DVD players did not compare a set of selected codes. (Order at 15-16.)

If the Court adopts the Southern District's construction of either "auxiliary device" or "set of selected codes," this motion should be granted, because there can be no genuine issue of material fact concerning non-infringement. In the present case, Guardian accuses exactly the same technology and functionality of infringing the same patent claims as were at issue in the *Sony* case. The Court should adopt the reasoning of the Southern District Court and hold that all asserted claims of the '158 patent are not infringed.

## FACTUAL BACKGROUND

### A.     The Asserted Claims of the '158 Patent Are Directed to an "Auxiliary Device" for Playing Substitute Video Material

The '158 Patent is entitled "Selective Video Playing System." It is directed to a method and means of "controlling the playing of video recordings whereby authorised persons can select which classifications of material can be viewed." (Ex. B to Raife Decl. ("'158 Patent") at 1:57-61.) The '158 Patent described and claimed *two* embodiments—(1) preventing play of an *entire* video program that is of a prohibited classification, and (2) playing a video program, but replacing unwanted program *portions* with substitute program material from a second, auxiliary device. (*Id.* at 5:7-14.) The first embodiment was directed to preventing play of an entire video program. All claims directed at this first embodiment were canceled during reexamination of the patent.

The '158 Patent introduces the second embodiment as follows:

> The selective playing function described above [*i.e.*, the first embodiment] is directed to simply terminating replay of a tape which is of a prohibited classification. This is a desirable capability if, for

2

example, the objective is to prevent children watching pornographic tapes.  A further capability of the invention, directed to providing **means for replacing unwanted program with programme from another source**, will now be described.

(*Id.* (emphasis added).)

The patent discusses the "auxiliary device" only with respect to the second embodiment.  The microcomputer of this second embodiment sends a signal to an "auxiliary device" which is "used . . . to provide substitution of alternative programme on detection of prescribed codes."  (*Id.* at 5:15-19.)  If the microcomputer determines that the main program material should be replaced, a signal is sent to the auxiliary device that produces suitable replacement programming.  As the patent explains, "[o]n receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed instead of the [material from the] replay signal output."  (*Id.* at 5:35-41.)  Only after the "replace" code is no longer detected does the microcomputer switch back to the main program tape, which "is now positioned beyond the material to be replaced and ready to resume playing the desired program."  (*Id.* at 5:26-41 (numerals omitted).)

Asserted claims 8 and 19—the only asserted independent claims—are directed to the second embodiment, as are their respective dependent claims, namely, claims 9-11 and 20-22.  Although claim 8 is a method claim and claim 19 describes an apparatus, both require "sending a signal to an **auxiliary device**."

## B. Guardian's Infringement Contentions Do Not Identify an Auxiliary Device as Required by the Asserted Claims

Guardian asserts that claims 8 and 19 and dependent claims 9-11 and 20-22 cover (in a single device) the blocking of entire video programs.  Yet, Guardian's

3

infringement contentions identify <u>no auxiliary device</u> for playing substitute video material.  (Ex. C to Raife Decl. ("Contentions") at e.g., 4, 12, and 13)  Instead, Guardian's contentions simply assert that some unidentified "auxiliary device" exists within the accused DVD players:

| sending a signal to an auxiliary device, | If, in the preceding comparison operation, the Player determines that the parental control level associated with the video program exceeds the level that can be played, the controller will send a signal to an auxiliary device within the Player. |
|---|---|

Guardian fails to identify what component might constitute the "auxiliary device" or where it can be found "within" the accused DVD players.  Guardian seeks to skirt this critical claim limitation because it knows there is no such thing that meets the requirements of the claims.

While Guardian's contentions do not identify an "auxiliary device," in past cases, Guardian contended one-time programmable flash memory in the player was an "auxiliary device" that provides a parental control menu that is displayed if an objectionable rating is detected on a disc inserted in the DVD player.  (Order at 11.)  But Guardian's past efforts to read the now-asserted claims on DVD players, like those now accused, failed when the Southern District of California granted summary judgment of non-infringement.

### C.    The Asserted Claims Also Require Comparing a Set of Codes

The asserted claims also require "comparing the detected code to a set of selected codes."  ('158 Patent at claims 8 and 19.)  The claim language expressly requires the received code to be compared to plural codes: "a set of *codes*." (*Id.* (emphasis added).)  The specification is consistent with the claim requirement. Each bit stored in a table in the microcomputer "correspond[s] to a unique classification code."  (*Id.* at 3:41-49.)  The table contains more than one code, each of which has been assigned a value by the user.  (*Id.*)  A received code is compared to this set of classification codes to determine if the received program contains

4

1  material corresponding to any one of the plural classifications; if it contains such
2  classifications, it should be blocked.  (*Id.* at 3:49-4:15.)  The classification codes
3  are independent from each other; for example, the user can decide to allow violent
4  scenes but prohibit sexually explicit scenes by setting each bit as desired.  (*Id.*)  In
5  this way, a user can choose to block material based upon any or all of multiple
6  different content characteristics.  (*Id.*)

### D.    Summary Judgment Of Non-Infringement In *Sony*

#### 1.    Litigation History

9      Guardian's pursuit of patent infringement claims began more than 15 years
10  ago, as described by the Federal Circuit in an opinion reversing a dismissal of
11  declaratory judgment actions in 2006.  *See Sony Elecs. Inc. v. Guardian Media
12  Tech.*, 497 F.3d 1271, 1273 (Fed. Cir. 2007).  In 1999, Vogel, the named inventor,
13  began accusing certain manufacturers of infringing claims 1, 12 and 14 of the '158
14  Patent.  *Sony*, 497 F.3d at 1274, 1276, 1279.  As noted above, those claims have
15  since been canceled.

16      Unlike the system providing an "auxiliary device" that plays substitute video
17  material described in now-asserted claims 8-11 and 19-22, the claims that Vogel
18  asserted in 1999 (claims 1, 12 and 14) were different, and encompassed selectively
19  playing or blocking *an entire* video program—not just replacing an unwanted
20  *portion* of the video program with substitute video material.  Thus, the user is
21  permitted to play the entire video program, or the entire video program is blocked.
22  Objectionable material within a video program is not replaced by alternative
23  program material from a second, auxiliary device as contemplated by the now-
24  asserted claims.

25      In 2005, Guardian alleged that Sony and other manufacturers infringed the
26  '158 Patent in a declaratory relief action brought by the manufacturers in the
27  Southern District of California.  The manufacturers thereafter filed a reexamination
28  request, which the PTO granted as to all claims of the '158 Patent.  Initially,

5

1    Guardian's response was to *cancel* the only two independent claims now-at-issue

2    (claims 8 and 19) and to pursue the broader claims directed to the first

3    embodiment, *i.e.*, selectively playing or blocking *an entire* video program.

4    Guardian ultimately gave up on the claims directed to the first embodiment and

5    canceled all of them.  (Order at 6.)  At the same time, Guardian resurrected

6    previously canceled claims 8 and 19 and convinced the PTO to confirm their

7    patentability by arguing that they differed from prior art that blocked the playing of

8    an entire video program at its outset.  (*Id.*)  Prior to the reexamination, Guardian

9    had never before asserted claims 8-11 and 19-22—the claims directed to the

10   second embodiment and at issue in this case—in any litigation.

11          After the reexamination, Guardian asserted claims 8-11 and 19-22 of the

12   '158 Patent against Sony and the other manufacturers of DVD players.  (*Id.*)

13   These manufacturers then filed a motion for summary judgment of non-

14   infringement.  In their motion, the manufacturers argued that the accused DVD

15   players acted to stop objectionable material when a DVD is first inserted into the

16   player, whereas the surviving claims of the '158 Patent require an "auxiliary

17   device" that plays substitute material after a program has started and only during

18   the blocked portions of a program.  The manufacturers also argued that the accused

19   DVD players did not perform a comparison against a "set of codes" as required by

20   the asserted claims.

21                    **2.      Motion for Summary Judgment Granted**

22          In granting summary judgment of non-infringement in *Sony*, Judge Gonzalez

23   construed the claim term "auxiliary device" to mean "the source of substitute video

24   material, where such material may include messages, information, advertisements

25   or other video programs."  (Order at 11.)  The Court concluded that no "auxiliary

26   device" existed in the accused DVD players because nothing played substitute

27   video material when the players detected a code signifying potentially undesired

28   material.  (*Id*. at 12.)  Instead, the standard technology the accused devices

6

employed merely prevented the playing of the programs on the DVDs at the outset, when the DVDs were inserted into the devices.  (*Id.*)

The Southern District Court granted summary judgment of non-infringement for a second, alternative reason as well:  the accused products did not perform a comparison against a "set of codes"—as required by all asserted claims—but rather compared against a single code.  Guardian argued that the claim term "a set of selected codes" should be construed broadly to cover comparing only one code, but Judge Gonzalez reasoned that this was incompatible with the plain meaning of the plural *codes*.  (Order at 15-16.)

Although Guardian asked the Southern District Court to vacate its decision after it settled with the manufacturers in *Sony*, and the Court did so, the Southern District opinion was never reconsidered or reversed on appeal, and its persuasive reasoning is undiminished.

### E.   The Accused DVD Players Do Not Replace Unwanted Content Within a Playing Video Program

Pursuant to this Court's Scheduling Order (D.I. 114), Guardian has served infringement contentions.  Guardian asserts that its claim charts are representative of how all DVD players sold by each of the Defendants infringe the asserted claims.  (Raife Decl., Ex. D at 3.)  Indeed, Guardian has only charted a single accused model for each Defendant.  (*Id.* at 3-4.)  The manner in which all charted DVD players operate as pertinent to the asserted claims is beyond dispute, and is illustrated here with specific reference to the Insignia standalone DVD player, model NS-DVD-1, and a DVD disc that supports parental lock.  The accompanying Declaration of Lucia E. Ballard details the operation of the DVD players that Guardian accuses in its Infringement Contentions. The specific disc used to demonstrate operation of the accused players contains the movie *The Breakfast Club*, which has a MPAA rating of R.

sf-3491849

### 1. Operation of Accused DVD Players with Parental Control Disabled

The exemplar accused DVD player, the Insignia NS-DVD-1, is a standalone DVD player. It is not a system comprising two or more players. As illustrated below in Figures 1-6, when the Insignia has its parental-control feature *disabled*, the content on a disc may be played regardless of its rating. Figures 1-6 illustrate this operation using the exemplary *Breakfast Club* DVD. When the player is powered on, "no disc" appears on the television screen (Figure 1). When the "open/close" button is depressed, the disc tray opens and "open" appears on the screen (Figure 2). When the *Breakfast Club* disc is inserted and the "open/close" button is depressed again, the tray closes and "loading" appears on the screen (Figure 3). The FBI copyright warning then appears (Figure 4), followed by an introductory video sequence (Figure 5), followed by the DVD main menu (Figure 6). (Ballard Decl. ¶¶ 1-5.) After selecting "play" in the DVD main menu, the movie plays (Figures 7 and 8). (*Id.* ¶ 6.)



Figure 1



Figure 2



Figure 3



Figure 4

8

sf-3491849





## 2. Setting the Parental-Control Feature on the Accused Players

Parental control in the accused DVD players is set from control menus. On the exemplary Insignia player, the control menus can be accessed by depressing the "setup" button on the remote control. Selecting "DVD" allows you to access the "parental-control" menu (Figure 9). (*Id.* ¶¶ 7-8.) Upon selecting "Parental," a screen appears displaying a list of possible parental control levels, *e.g*., "G," "PG," or "R" (Figure 10). Upon selecting a new parental control level, a password is requested (Figure 11). Entering the password changes the parental control level for the player (Figure 12). (*Id.* ¶¶ 9-11.)

9



Figure 9                    Figure 10



Figure 11                   Figure 12

### 3. Operation of Accused DVD Players with Parental Control Enabled

When the accused DVD players have their parental control feature enabled and set at a level that would block an R-rated disc, such as the *Breakfast Club* disc, rather than showing the FBI warning and proceeding on to the main menu as described above, a parental-control message is displayed on the television screen when such a disc is first inserted in the DVD player (*See* Figure 13 below).  When the exemplary Insignia player is powered on, "no disc" appears on the screen (*See* Figure 1, above).  When the "open/close" button is depressed, the disc tray opens and "open" appears on the screen (*See* Figure 2 above).  When the *Breakfast Club* disc is inserted and the "open/close" button is depressed again, the tray closes and "loading" appears on the screen.  (See Figures 1-3 above).

Next, as shown in Figure 13 below, a screen immediately appears with the message:  "*The parental level of the player has been set.  Press 'yes' to*

10

*continue*." This screen also has two selectable options: "Yes" and "Stop." (*Id.* ¶ 13 (emphasis added).) Figure 13 is not shown during normal play; that is, it is not shown when parental control is turned off. (*Id.* ¶¶ 1-6.)



Figure 13

If "Stop" is selected at the screen shown in Figure 13, the screen in Figure 14 appears with the following message: "*This movie will not play due to the current parental level setting of the player. Please eject the disc*." (*Id.* ¶¶ 16-17 (emphasis added).) If "Yes" is selected at the screen shown in Figure 13, a request to enter a password is displayed at the top left corner of the screen. If the correct password is entered (Figure 15), the disc will begin to play. (*Id.* ¶¶ 14-15.)

  

Figure 14                    Figure 15

Then, the FBI copyright warning appears on the screen (Figure 16), followed by the introductory video sequence (Figure 17), followed by main DVD menu (Figure 18). Only after "play movie" is selected will the movie start to play (Figures 19-20). (*Id.* ¶ 15.)

sf-3491849



Figure 16



Figure 17



Figure 18



Figure 19



Figure 20

Thus, after the correct PIN is entered (that is, when the parental control is deactivated), the subsequent sequence is exactly the same as when the parental control was turned off from the beginning.  *Compare* Figures 4-8 with Figures 16-20.  No portion of the video is replaced or substituted for alternative programming.

There can be no dispute that this is how the exemplary Insignia DVD player operates, nor can there be any dispute that this is how all of the accused (charted) DVD players operate (with the look of the superimposed parental control screens being different for different players as shown in the Ballard Declaration).

Unlike the system described and claimed in the '158 Patent, the accused (charted) stand-alone DVD players do not have any associated *auxiliary device* to allow substitution of alternate program material to be played from that auxiliary device.  The accused players also compare only a DVD's rating code to a single code:  that is a program's MPAA rating is compared to only a single parentally-set level to determine whether play of the program on the DVD should be prevented.  Indeed, the accused DVD players in this case operate in the exact same way that the non-infringing DVD players operated in the *Sony* action.

## ARGUMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A determination of infringement (or lack thereof) of a U.S. patent requires a two-step analysis.  *See, e.g., PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1362 (Fed. Cir. 2005).  First, the court must ascertain the scope of the claims as a matter of law.  *See id.*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc).  Construction of the claims need not be an exhaustive process, "[a]s long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes."  *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) (affirming summary judgment of non-infringement without providing a complete claim construction because disputed terms were properly construed to exclude the structures that were used in the accused device).  The claims define the scope of the patented invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  The words of a claim "are generally given their ordinary and

13

1   customary meaning" as understood by a person of ordinary skill in the art, and

2   "must be read in view of the specification, of which they are a part." *Id.* at 1312-

3   1313, 1315.  The prosecution history should also be considered in ascertaining the

4   scope of the claims since it provides evidence of how the Patent Office and the

5   inventor understood the invention.  *Id.* at 1317;

6        Second, a determination is made as to whether the properly construed claims

7   cover the accused device, either literally or under the doctrine of equivalents.  *See*

8   *PC Connector*, 406 F.3d at 1362, 1364.  This second step is a question of fact; but

9   when there are no genuine issues of material fact in dispute, a grant of summary

10  judgment is proper.  *See id.* at 1364; *Ballard Med. Prods.*, 268 F.3d at 1362.

11  Literal infringement requires that each and every claim limitation appear in an

12  accused product.  *See, e.g.*, *Frank's Casing Crew & Rental Tools, Inc. v.*

13  *Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).  Where literal

14  infringement is not present, infringement under the doctrine of equivalents may be

15  found where the "accused product or process contain[s] elements identical or

16  equivalent to each claimed element of the patented invention."  *Warner-Jenkinson*

17  *Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

18       Here, the two separate and independent grounds that support summary

19  judgment of non-infringement require construction of claim terms.  Summary

20  judgment hinges on these constructions, as there can be no dispute about the

21  operation of the accused DVD players as related to the asserted claims.  *See Rheox,*

22  *Inc. v. Entact, Inc.*, 276 F.3d 1319, 1324 (Fed. Cir. 2002) ("where the parties do

23  not dispute any relevant facts regarding the accused product[s] but disagree over

24  possible claim interpretations, the question of literal infringement collapses into

25  claim construction and is amenable to summary judgment"); *see also Ballard Med.*

26  *Prods.*, 268 F.3d at 1362 ("Because there is no dispute over the structure of the

27  accused device, resolution of the claim construction issue in this case dictates the

28  outcome of the infringement inquiry.").

14

## I.      THE ACCUSED DVD PLAYERS DO NOT HAVE THE "AUXILIARY DEVICE" THAT THE CLAIMS REQUIRE

In 2009, Judge Gonzalez of the Southern District of California granted summary judgment in favor of Sony and other parties that Guardian had accused of infringing the '158 Patent.  Guardian's accusations in this case are materially identical to its accusations against Sony.  The first ground for this Motion is the same as the motion Judge Gonzalez granted:  namely, the asserted claims require transmitting signals to an "auxiliary device" that is the source of substitute video material, but the products Guardian accuses of infringement do not include any auxiliary device that provides substitute video material.  In fact, the accused devices do not play substitute video material at all.  Nothing therefore is ever *substituted* by an auxiliary device.

Judge Gonzalez's claim construction of "auxiliary device" was correct, as was her finding that the DVD players at issue in that case did not infringe the '158 patent either literally or under the doctrine of equivalents.  The Court should reach the same conclusions in this case.

### A.      The Prior Construction of "Auxiliary Device" As "The Source of Substitute Video Material" Is Correct

Judge Gonzalez construed the claim term "auxiliary device" in the *Sony* action as "the source of substitute video material, where such material may include messages, information, advertisements or other video programs." [2]  (Order at 11.)

_____

[2] The Eastern District of Texas similarly construed the term "auxiliary device" in the '158 patent to mean "source of substitute program material."  *See Guardian Media Techs., Ltd. v. Acer Am. Corp.*, No. 6:10-cv-597, 2013 WL 1866901, at *3-5 (E.D. Tex. May 2, 2013).  That court rejected Guardian's argument that the term meant merely "a device that provides a supplementary function" because "reviewing the intrinsic evidence, it is clear that an 'auxiliary device' is a source of substitute programming." *Id*. at *4.  The Court further

(Footnote continues on next page.)

15

The court properly focused on the use of the term "auxiliary device" within the patent specification and concluded that its only use was as a source of substitute video material.  The court also noted that Guardian's counsel conceded at oral argument that the auxiliary device provides "substitute video material":

> A review of the specification reveals that the sole purpose of the auxiliary device is to provide "substitute video material."  The specification states the patent's purpose is "directed to providing means for *replacing* unwanted program with programme [sic] from another source."  (['158 Patent] 5:12-15) (emphasis added).  Further, at oral argument, Guardian agreed the auxiliary device provides substitute video material.

(Order at 10.)

The claims "must be read in view of the specification, of which they are a part."  *Phillips,* 415 F.3d at 1315.  When interpreting the claims, the written description is of particular import, and it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on [it] for guidance as to the meaning of the claims."  *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) (quoting *Phillips*, 415 F.3d at 1317.)

Here, the '158 Patent specification uses the term "auxiliary device" consistently and in only one sense:  as the source of substitute video material to be played in lieu of the objectionable material in the main video.  The patent's written

---

(Footnote continued from previous page.)

construed "substitute program material" as "video material that replaces a portion of a video program."  *Id.* at *9.  The Eastern District's construction is consistent with the Southern District's construction.  Thus, this motion should be granted under either construction.

16

sf-3491849

description contains no reference to "auxiliary device" until column five.  In this portion of the specification, the patent describes the second embodiment directed at replacing potentially objectionable video material with substitute video from the "auxiliary device."  The second embodiment is introduced using the following language:  "A further capability of the invention, directed to providing means for replacing unwanted program with programme from another source, will now be described."  ('158 Patent, 5:11-14 (emphasis added).)

The first actual reference to "auxiliary device" in the specification is at column 5, line 27.  The specification describes a microcomputer detecting the classification code for a "REPLACE" code and, if that REPLACE code is detected, sending a signal through the auxiliary output of the system to an "auxiliary device":

> On receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed ….

(*Id.* at 5:26-31 (emphasis added).)  The microcomputer continues to monitor for the "REPLACE" code, and when it ceases detecting that code, the display is switched from the auxiliary device's substitute material back to the main video.  "The main program tape is now positioned beyond the material to be replaced and ready to resume playing the desired program.  When the auxiliary device has finished replaying the substitute material, it sends a signal to auxiliary input 12, which is received by microcomputer 6 which causes replay of the first program to resume."  (*Id.* at 5:35-41 (emphasis added).)  The patent also describes that the "substitution capability of the invention" can be used to replace original advertisements with alternative advertisements, in which case "the auxiliary device can be a VCR that plays a recording comprising a number of advertisements or messages, each of which is longer in duration than the material to be replaced, ensuring that the main program into which the alternative material is to be inserted

17

1    resumes without interruption" after the replacement video material is shown.  (*Id*.

2    at 5:45-55 (emphasis added).)

3           The patent thus consistently uses "auxiliary device" to mean the source of

4    substitute video material as already concluded by two different courts.  The Court

5    should therefore adopt the Southern District's construction of "auxiliary device."

6                 **B.    The Accused Devices Include No "Auxiliary Device" and
                        Therefore Do Not Infringe the '158 Patent**

7           In light of its construction of "auxiliary device," the Southern District held

8    that the video players accused in the *Sony* case did not infringe, because the players

9    did not include a device that replaced potentially objectionable material with

10   substitute video material.  In reaching this conclusion, the court noted and rejected

11   Guardian's contention that the memory within a DVD player that was the source of

12   the parental control menu satisfied the "auxiliary device" element of the claims:

13          When reviewing this evidence, it is important to note the parental-control-

14   menu did not *replace* any content.  Instead, the parental-control-menu merely

15   *delayed* the play of the title sequence.  Once counsel entered the parental-control

16   pin, the screen showed all four screens of the title sequence.  As such, the parental-

17   control-menu is not *substitute* video material.  Because the flash or OTP memories

18   only provide the parental-control-menu, which is not substitute video material, the

19   flash or OTP memories are not auxiliary devices.  Based on this evidence, a

20   reasonable jury could only conclude the accused DVD players do not literally

21   infringe the '158 patent.

22   (Order at 12.)

23          As noted above, all asserted claims of the '158 Patent required "sending a

24   signal to an **auxiliary device**."  In this case, Guardian has failed even to identify

25   any component within the DVD players that is an "auxiliary device."  In its

26   infringement contentions, Guardian simply says that the accused, charted DVD

27   players "send[] a signal to an auxiliary device *within* the [p]layer[s]."  (Contentions

28

                                            18

1    at 4 and 12.)  Guardian made the same vague contentions in the *Sony* case, to no

2    avail.  As can be seen from the Ballard Declaration, the products at issue in this

3    case operate in the same way as the non-infringing products in *Sony*.

4          The accused video players delay commencing display of the original video

5    content until a parental code is entered.  After the code is entered, every portion of

6    the DVD is shown, just as it is when no parental controls are entered in the first

7    place.  The parental control menu is not substitute video material, and the DVD

8    players include no "auxiliary device" as the claims require.  Put differently, no

9    portion of the original video material is ever replaced by alternative video material,

10   and no device within the DVD players provides such functionality.  Because no

11   "auxiliary device" exists in the DVD players, there can be no transmission of a

12   signal to that device.  Therefore, the asserted claims are not literally infringed.

13         After concluding that the DVD players at issue in the *Sony* case did not

14   literally infringe the '158 Patent, the Southern District further held that the devices

15   did not infringe under the doctrine of equivalents.

16               The DVD players do not infringe under the doctrine of equivalents

17               because there is no equivalent of the auxiliary device.  Although the

18               independent claim does not require playback, it requires the existence

19               of an auxiliary device.  The parties agree that the auxiliary device

20               must be a source of video material.  Further, as discussed above, the

21               video material must be substitute video material.  As used in the

22               patent, "substitute" is a synonym for "replace."  The parental-control-

23               menu, which is the only video material generated by the flash or OTP

24               memory, does not replace anything.  Because the flash or OTP

25               memory do not provide substitute video material, or the equivalent

26               substitute material, the DVD players do not infringe the '158 patent

27               under the doctrine of equivalents.

28   Order at 13.

sf-3491849

1     The Southern District's conclusion was correct and is equally applicable to

2  this case.  To establish infringement through the doctrine of equivalents, Guardian

3  would have to show that the accused devices include some structure that performs

4  substantially the same function in substantially the same way to achieve

5  substantially the same result as the "auxiliary device" described in the '158 Patent.

6  *See Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1373 (Fed. Cir. 2014) (affirming

7  summary judgment of non-infringement under the doctrine of equivalents and

8  noting "[w]e have held that 'a patentee may prove that a particular claim element is

9  met under the doctrine of equivalents' … by showing that "the accused product

10  performs substantially the same function in substantially the same way with

11  substantially the same result" as claimed in the patent.'").  In addition to not even

12  identifying an "auxiliary device" in its infringement contentions, Guardian's

13  allegations regarding the doctrine of equivalents are insufficient:

14          [Defendant] also infringes under the Doctrine of Equivalents because,

15          to the extent that there are any differences between the Player and this

16          claim element (which Guardian submits is not the case), such

17          differences are insubstantial.  As discussed above, the Player performs

18          substantially the same function (sending a signal to an auxiliary

19          device based upon the comparison result) in substantially the same

20          way (by providing a signal to an auxiliary device) to obtain

21          substantially the same result (a sent signal) as disclosed in this claim

22          element.

23  (Contentions at 4 and 13.)

24      These contentions simply parrot claim language in conclusory fashion; they

25  utterly fail to identify anything in the accused DVD players that is equivalent to the

26  "auxiliary device," i.e., something that provides substitute video programming.

27  Nothing provides replacement video to be displayed in lieu of objectionable

28

sf-3491849

1   material on a DVD, let alone achieves that replacement in the *same way* and with

2   the *same result* as the "auxiliary device" described in the patent.

3     Furthermore, an infringement theory relying upon the doctrine of

4   equivalents in this case would effectively eliminate the requirement of an

5   "auxiliary device" from the claims.  The doctrine of equivalents is unavailable as a

6   matter of law "if a theory of equivalence would entirely vitiate a particular claim

7   element."  *Warner-Jenkinson Co.*, 520 U.S. at 39 n.8.  A claim element is vitiated

8   when the alleged equivalent structure is "not a 'subtle difference in degree,' but

9   rather, 'a clear, substantial difference or difference in kind.'"  *Freedman Seating*

10  *Co. v. Am. Seating Co.*, 420 F.3d 1350, 1361 (Fed. Cir. 2005).  No structure within

11  the accused DVD players represents a "subtle difference in degree" from the

12  claimed "auxiliary device" that must be the source of substitute video material.

13  The Court should hold that application of the doctrine of equivalents is therefore

14  foreclosed to Guardian as a matter of law.  *Panduit Corp. v. HellermannTyton*

15  *Corp.*, 451 F.3d 819, 826, 830 (Fed. Cir. 2006).

16    **II. THE ACCUSED DVD PLAYERS DO NOT PERFORM A**
        **COMPARISON WITH A "SET OF SELECTED CODES" AS**

17       **THE CLAIMS REQUIRE**

18    Summary judgment of non-infringement should be granted on yet another

19  basis:  the accused products do not perform a comparison against a "set of codes,"

20  but only against a single code.  In this respect as well, Guardian's accusations

21  against Defendants are substantively identical to its accusations against the *Sony*

22  defendants as the operative code in both cases corresponds to the MPAA rating of

23  the inserted disc.  Guardian's infringement contentions accuse the comparison

24  against the single parental control level code as meeting the "set of codes:

25  limitation, but the parental control level is always a single value at any given time

26  when a comparison is made.  (Contentions at 3 and 12.)  Unlike the '158 patented

27  device, which employed a combination of codes, the parental control system of the

28  accused players uses only one code at a time, and the comparison is always against

sf-3491849

a single code.  Judge Gonzalez correctly construed the "a set of selected codes" as "more than one code."  (Order at 16.)  As the same construction should be applied here, the accused players do not infringe this limitation.

### A.    "Set of Selected Codes" Was Properly Construed As More Than One Code

Properly construed, the "set of selected codes" in the claims of the '158 Patent should be understood to mean more than one code.  Judge Gonzalez correctly construed the limitation "comparing the detected code to a set of selected codes" as "comparing a detected program classification code to more than one code, each of which has been assigned a value by the user."  (*Id.* at 16.)

In determining that this is the correct construction, Judge Gonzalez focused on the plain language of the claims.  The claim language uses the plural form "codes" for the content of the set, in contrast with the singular form "code" used as the point of comparison.  As Judge Gonzalez noted, if the patentee "had intended the set to contain only one code, he could have used the singular word 'code.'" (*Id.* at 15.)

Even if the term "set," taken in isolation, could encompass a set of only one element, here the use of the term "codes" makes clear that the contents of the set are multiple.  (*See* Order at 15, 16 (dismissing Guardian's argument that a "set" may have one element).)  The scope of a plural claim element does not include a single instance of that element.  *See Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1375 (Fed. Cir. 2001) (finding "rear wall" to have a broader scope than "rear walls").

This interpretation is consistent with both the specification and the prosecution history.  The '158 Patent teaches using a table of bits to store the selected codes, each bit "corresponding to a unique classification code."  ('158 Patent at 3:41-45.)  A user may set each code independently.  (*Id.* at 4:1-10.)  Each code is also evaluated independently when a program begins to play.  (*Id.* at 3:47-

22

54.)  Throughout the specification, the "set of codes" contains at least three, and up to as many as 256, separate classification codes.  (*See id.* at 4:16-22.)  Accordingly, comparison to "a set of selected codes" should be construed as comparison to more than one code.

**B.   The Accused Devices Do Not Perform a Comparison Against a "Set of Codes" and Therefore Do Not Infringe the '158 Patent**

The accused devices do not compare the rating of the current DVD against multiple codes, as the properly construed claim requires.  Instead, they compare against a single code:  the current parental settings level.  This is the only code accused in Guardian's infringement contentions.  Each of the accused devices allows for setting a single number, between 1 and 8, as the parental settings level.  (Ballard Dec. ¶¶ 9, 23, 36, 49, 61.)  This number corresponds to the familiar MPAA rating system, which classifies films on a single scale from "G" to adult.  The parental control systems of the accused devices do not allow for setting multiple codes, such as separate codes for violent, sexual, or otherwise adult content, as seen in the '158 patent.  (*Id.*)  They permit comparison only against a single code.  (*Id.*)

For this reason, Judge Gonzalez found the single code of the accused systems not to infringe the "set of codes" element of the claims.  (Order at 18.)  She also noted that "it would defy logic to make a distinction between 'code' and 'codes' during claim construction, then find 'codes' meant 'code' under the doctrine of equivalents."  (*Id.* at 19.)  Here, as well, the fact that the accused devices do not compare against multiple codes means that they do not infringe the '158 patent, either literally or under the doctrine of equivalents.  Accordingly, the court should grant summary judgment on this basis as well.

## CONCLUSION

For the reasons outlined in this memorandum, the Court should grant Defendants' motion for summary judgment of non-infringement of the '158 Patent

23

1

2  Dated:  January 16, 2014

3

4

5

6

7

8

9  Dated:  January 16, 2015

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Charles S. Barquist
MORRISON & FOERSTER LLP

By:   /s/ Charles S. Barquist
         Charles S. Barquist

Attorneys for Defendants
BEST BUY CO., INC.,
COSTCO WHOLESALE CORP., and
TARGET CORP.

By: /s/ Robert T. Cruzen
       Robert T. Cruzen

Attorneys for Defendant
AMAZON.COM, INC.

24